All right, we'll proceed to the next case. You may be seated. By the way, I'm going to recognize the presence of the students from EMI and their professors here. The port of the military bearing I'm seeing here is really nice, gentlemen and ladies, to see you stand up and remain standing until told to sit down. That tells me you're getting orders very nicely. One who spent quite a bit of time in the United States Navy, I appreciate that and appreciate your presence here today. We'll proceed to the third case, which is Liberty Mutual v. Atain. We will hear from the appellant's counsel. May it please the court. Good morning, your honors. My name is Marcy Scout. I represent the appellant, Atain Specialty Insurance Company. Liberty Mutual brought this claim against Atain, seeking to enforce an indemnity right to recoup $1 million that was paid on an appeal bond that was purchased by Atain on behalf of its insured. Let me just ask something that's curious to me about this appeal bond. You have a case, Atain is involved in it, and it proceeds through the process. They lose almost $1 million there. It goes up on appeal. Atain gets an appeal bond from this big old company called Liberty, which is like number two in the nation. They're giving these out to sustain an appeal. The process goes along, someone comes along and says, okay, you're not liable to pay as an insurance company. And then somewhere between the two groups of people here, between your company and Liberty, it gets mixed up as to whether this bond is closed. Can you close that bond? Your honor, technically speaking, the bond says it will become void if the judgment is paid or the underlying judgment is voided. I'm trying to figure out the purpose of a bond. The reason the court is allowing this appeal to go forward is somebody has put up a bond to tell this plaintiff, okay, we're going to not pay right now because you're going to get paid if you win. How do you close that bond? Yeah, so the purpose of it is to ensure the plaintiff is going to get paid. That's right. What Liberty's counsel recognized when asked about this... My question is, how can you get rid of that bond? I don't care if you're liable or not. You have a bond. This is the bond you put up. We will pay you. Right. And how do you get rid of it? So claim counsel for Liberty acknowledged that one of the discharging the bond for whatever reason. That did not happen. It did not. So you didn't go to court and get it. So what's the other way? Well, the other ways are payment or the judgment being overturned. Didn't do that either. Those two things didn't happen either. So how can you get, even if everything you say happened here, at the end of the day, that bond is still there. Right. The bond is going to be paid. You're the one that went and got it. So how do you get out of it? I get your point in terms of the back and forth. They told you they closed it, the whole bit. And this business that they're the big company and you're the little company. There's no such thing here. All these are big companies. And I admit that anybody, I don't know who your lawyers were, that would think that you can close a appeal bond by some agents and some claim directors going back and forth with their communication as a court. So you either got to go to court and get it or you got to pay it. Right. So your question, I think, goes directly to the issue is how is Attain prejudiced by any of this, if they couldn't just go get it closed? That's a good way of putting it. And so to answer that question, Attain could have gone. So Liberty's counsel said, well, you go get a court order discharging it. And so Attain could have gone to the trial court. It did. It's confusing to you. There's like three courts here, right? There's the state trial court where the underlying action is happening. There is the coverage action. And then there's the action that we're hearing now. So when you say that he could have gone to the court, you mean, I just want to make sure I understand. So what we hypothesize could have and perhaps should have happened is that someone should have gone to the state trial court and said, hi, we're Liberty. We put up this bond. We did that because at the time we thought Attain might be liable to provide a defense in this case. Turns out they're not. Here's this court order and a coverage action. Please let Attain and Liberty out of the bond. At which point, presumably the state trial court would have said to the defendants, so it appears that you don't have an appeal bond anymore. And unless you get a new appeal bond pronto, I'm going to dismiss your appeal because you don't have an appeal. Is that procedurally what should have happened? Yeah. Procedurally, whether it would be Liberty or Attain going to seek, yeah. They would seek that relief. State trial court judge, look, there's no more coverage. We shouldn't have to pay on this bond anymore. And nobody knew this? Attain had had three appeal bonds in a decade. This was the first appeal bond ever handled by... She's got a lesson to learn from this case. I think you're correct about that, Your Honor. Absolutely. Let me intuitively think about it. Essentially, you take a million dollars and you hand it to the appeal court to get the bond. And says, here's a million dollars. You get to be paid if you win. You then have negotiations and turns out, well, I'm not even liable for the appeal bond. I'm not liable on coverage. And he says, okay, we're going to cancel that. But you didn't go pick up the bond. Isn't that kind of what it is? You did not go and get your money back. You left it right there. Not only do they want the appeal bond money back, they want the premiums of $2,800 back on top of it. Right. And so you're right. They did leave it there. And if they had gone to the state trial court and asked, the state trial court may well have said, yes, I'll allow you to remove that bond, insured. You go get a new bond in its place. The state trial court could well have said that. The state trial court could also have said, no, that appeal bond is staying in place. And if the appeal bond stayed in place and if Attain knew the appeal bond was staying in place, then it could have taken other steps to minimize its loss. Like what? It could have taken its coverage action coupled with the arguments on the appeal merits in the state court case and gone to the plaintiffs and tried to negotiate a settlement for something less than a million dollars. That would have mitigated its loss. So I'm, this is really interesting to me. I was trying to figure out what should happen in this case. But I'm not going to find any of this discussion in the record of this case. The corporate designee burdens on Attain. And as you say, this goes to prejudice. And they ask him, what would you have done if you had done? He's like, I don't know. Wait for the court order maybe? Right. So what Attain basically, he says, I don't know. What Attain said in the record, they were asked, what would you have done? And they said, we don't really know. We would have asked more questions. We would have expected direction. If Mr. Dunnigan had come back and said, hey, Liberty's not closing this bond. You're still on the hook. Their next question would have been, okay, what do we do? Give us some direction. And they would have started, kept going down that path. Don't you have lawyers? Yes. I mean, so you go to your lawyers and say, what do we do? It's all malpractice if you don't do something like this. That sounds like to me. Well, keep in mind that the defense counsel who's representing the insureds in the state court case is representing the insureds. Attain is paying their defense costs under due defense. I understand exactly how you did it. You took on something you probably didn't even have to do here, but you did it. And you paid for an appeal bond. You put a million dollars up there on the table. And then you had this little discussion about, well, we're going to close out the bond, but you never picked up the million dollars. Right. And the plaintiff did. And so now you're saying the plaintiff picked up the million dollars. We ought to be, at least Liberty ought to be equitably stopped from collecting that million dollars from us because they knew better, but we didn't. And that is true, Your Honor. They knew. It's true, you didn't know better. We did not. Attain was not experienced with these bonds. We can't have an estoppel jurisprudence that turns on weighing the relative merits of two different in-house legal departments. Oh, these guys seem really smart. These guys aren't so smart. That can't be a basis for equitable estoppel. Right. And Your Honor, I think here the idea is that Liberty, by not collecting premiums, by telling the agent that the bond was closed, it, sitting in that expert position, told Attain that the bond was taken care of. Procedurally, it was closed. They stopped collecting the premium. Right. The problem is the bond is, the million dollars, so to speak, is still there on appeal. Right. That's the problem. Yeah. And I think it has to be viewed in context, right? The indemnity agreement says premiums will continue to be charged until Liberty is provided documentation that satisfactory to Liberty of its discharge or release of all liability on the bonds. That wasn't given. Well, Liberty thought it was because Liberty closed it down. But there was no documentation that anything had been settled. Basically, you're talking about that. You're talking about the case on appeal. You need to provide documentation that case is open, not the coverage case. Two different things. You know what? Attain was smart enough to go to federal court for coverage, and knowing they got a case in state court, that's pretty savvy, to know that you can go there and get coverage determinations separate from this, but they don't know they got a separate case over there in state court that has a million dollars sitting on the table that they have guaranteed that they're going to pay? They don't know that? They did not understand that, no. They did not. And so when Liberty stops collecting premiums, it's because Liberty has been satisfied that the document shows there's no remaining liability on the bond. Again, your corporate designee didn't say I relied on that. When they stopped charging premiums, I figured you were off the hook. He says the only thing I looked at was these emails from Liberty. And your Honor, I know that that is what Liberty has said in their briefing, and they refer to page 91 of Mr. Dittmar's deposition, which is at the joint appendix 235. And that is what he says. You know, are there any other things that you relied on other than the email? And he says not that I'm aware of at this time. And then if we flip over five, six, seven pages in his deposition to JA 239, he's asked the question a little differently. He's asked what actions are you referring to where there's a longer interrogatory response that's being read about Liberty misleading Attain. And counsel asks what actions are you referring to there? What actions by Liberty, in essence, misled you? Well, included it says right there there was no further invoice for the premium on the bond from Liberty Mutual and the December 19th email. But that's about misleading you, not about what your reliance on the misleading statement is. Those are two, you agree for estoppel, those are two separate requirements. They have to mislead you and you have to rely. And I take your point that I see how that goes to misleading you. How does that go to reliance? They relied on that. I think it's a few pages later. Well, not just reliance in the ether, right? As I understand estoppel, you have to rely to your detriment. You have to do or forego something. And that doing or foregoing that something was to your detriment. Where does he say that there is something we did or didn't do to our detriment? Yeah, I don't know the testimony is, if we had known the bond wasn't released, we would have asked more questions and taken more steps. We know that Mr. Dunnigan. We're in a party that has to show estoppel to identify something a little more definitive than we would have done something? Well, we would have asked questions. We don't, I'm not the expert here. I don't know what I would have done. I would have asked questions of the experts to figure out what the next steps were. But this deposition is being taken as part of this lawsuit. Presumably by that point, Attain should have been able to figure out what they would have done differently. Well, and I think their agent, Mr. Dunnigan, said if he knew it hadn't been closed, he would have told Attain to go get a release. Liberties Claim Council says somebody should go get a release. That's what they would have done, but nobody told them they needed to and so they didn't do that. And their prejudice because they didn't do that, they didn't get a yes or no answer. Again, the no answer to the state trial court telling them, no, I'm not going to release this bond. I don't care that you have this coverage of determination. It's not Liberties Action. It's Attain's Action. They are the ones who ultimately could be liable for this. If they are no longer liable for it and they put a bond on it, they are the ones that ought to go and represent. I'm not liable. Liberty is not liable on this at all. What they have is a because you are liable on it. So why would they have to go to the court and say, okay, are they liable anymore? Because they got a bond and you said you're going to, this is what you contracted to get. And I'm not suggesting the burden was on Liberty to go take those actions. What I'm saying is when Liberty said the bond was closed down, Attain had started, remember what started this all is Attain gets the premium renewal. But it couldn't close it down. But it could have gone to the trial court and asked and the trial court could have said yes or no. Well, that's the same thing. You know what you're saying? They had to go to the trial court and say, Attain is no longer liable for this. But Attain is the one should have gone and told the trial court, we're not liable, then tell them. Right. And when I say they, let me clarify, when I say they, Attain could have gone to the state trial court and said, court, release this bond. And the court could have said, yes, great. I'll release you. Insurance, get a bond in its place. But Attain did none of that. It didn't. The trial court also could have said no. And if the trial court said no, Attain then could have taken other steps to try to minimize its loss, negotiating a settlement or with the underlying plaintiffs. Well, you know, you've got a million dollars on the table and you've got a jury verdict and you feel like you've got a strong case, not a settlement even before, before the coverage. You could have been doing that. There was no attempt to negotiate a settlement. Right. You were appealing this thing all the way to the Supreme Court. And you know, settlements are negotiated when the jury comes back with a verdict of 900 something million. That's when you come out and say, well, we can appeal it or we can settle something. There's a Senate to do those things. Not when it's already sitting up in the Supreme Court and been sitting there with a million dollar bond up there securing it. Pretty good facts to substantiate it by the way. And a jury verdict. And I don't know what the legal arguments were. Maybe you could have negotiated and got it down some, but I don't know what it would have been. Your Honor, can I tell you one other way they could have minimized the risk? The other way they could have minimized the risk was trying to renegotiate the deal with Liberty. Having Liberty look to the security of the insureds. The insureds owned the hotel property. It's not as though they were assetless. Doesn't Attain have a right to pursue that against McCliff? No. They are no longer, so the fact that they don't offer coverage, but they did in fact pay, they have no cause of action against McCliff. I'm asking. And I'm hesitant to answer, and this is why. I'm a Texas lawyer by nature. I do not know what West Virginia coverage law would be on that. And so I'm hesitant to give an answer that's incorrect. I would tell you that in my experience under Texas law, absolutely not. The insurance company would never be able to. I'm not saying there's coverage, but I'm just saying it seems like to me that's relevant when you start saying Liberty could have mitigated this damage. But I would think with McCliff, why wouldn't Attain be the one that's trying to do that? Right. And it could have been negotiated. And to answer your question, I don't know under West Virginia law. I can't answer that question. And so I don't want to give you inaccurate information. I'd rather give you no information than inaccurate information on that question. We'll give you some time. Thank you. We'll hear from you, Ms. Lee. All right. Give it to us. Why is it that Liberty, as I understand it, the second largest insurance company in America, would have this kind of a situation develop where someone tells them there's no coverage and we're not liable. And they said, we closed the bond. And don't at least have the savvy to say, well, where's the documentation? I mean, what did you close? Did you pay it? Or did the court do anything? I mean, it's sort of mind boggling. I mean, I gave a hard time to the old side, but it's true in terms of Liberty. You got lawyers, don't you? Well, your honor, very good point. I think the facts show that really it was a representation by Attain is what caused Liberty to internally document the closed bond event. So really, Liberty was relying upon the documentation that Attain provided saying this is in fact documentation that has been won, that the case has been won or closed, or the bond liability has been extinguished. I mean, it... The documentation was of the declaratory judgment relief. Correct, your honor. Why would Liberty think that could possibly extinguish this bond? I don't believe that Liberty did believe that that could possibly extinguish this bond. They did not look at the attached documentation. Is that what you're saying? Because Attain sent something and they said, attached to this is something that will show. And then so they didn't look at what was attached. I believe the testimony at the lower court or at the trial court level in the deposition was that they believed that because it was represented that this documentation was sufficient to show that the case had been won and closed, or closed, or the bond liability had been extinguished, that they believed that was in fact the correct documentation. I believe that is... Is that what you're saying? Well, and I don't know that that is kind of... Well, first off, may it please the court. My represent Liberty Mutual Insurance Company. I do want to... I think Attain has taken the facts of this case. They've put them into a bag and they've taken some out, they've put some in, they've kind of shaken them up and presented them to the appellate court to say, there's a disputed issue of fact. I think your honors have been very diligent in noting that some of the facts that have been presented are a little bit mischaracterized. And I want to go through that and clarify some of those mischaracterizations. Even with the facts as characterized, whatever, this is some messy stuff on both sides in terms of the insurance company Liberty and Attain Mutual. I mean, the questions we just posited with you then, you've got Liberty up there. They're the ones with the bond. What is it that they receive and say to the extent that they will say bond is closed? The bond closed doesn't mean you won't have to pay that bond. I mean, not getting premiums doesn't mean that the bond is dissolved. That's a court thing. And it seems to me, you have to have a lot of hope that, so like McClure or maybe whatever, that Attain can actually pay you for this, for you to say, okay, bond closed, to just walk away and say that's the end of it without doing one of those two things that probably everybody would think. That if you've got a bond, you put a million dollars up, you go to the court, and says court, release me from the bond, or you pay it. Said neither one of those happened. So, I mean, so it goes back and forth is the reason we'll say maybe mischaracterization of facts, but even with the facts clear, it's still messy. I think this is actually a very straightforward case. It's a breach of contract case. And I think the undisputed evidence at the trial court level show the judgment was, should have been entered and was entered in favor of Liberty. And in terms of the bond's closure, that is an internal billing event. And that is an undisputed fact. Liberty clicks a button that says the bond is closed. What that means is that they no longer charge a premium on the bond. That button can be clicked, and that has absolutely no impact on the legality of the bond and Liberty's obligations under that bond. And more importantly, this case is not about the bond. It's about the indemnity agreement and how that bond's closure somehow impacts the obligations of attain under the indemnity agreement. I don't see that. The only reason it comes up because of this doctrine called equitably stocked. All of what you say, they acknowledge that's true. But they say, that's true, but you shouldn't be allowed to do it because of da, da, da. That's the only, that makes it a little less straightforward on it. But it doesn't mean that you don't prevail. That's their perspective on it. They acknowledge what you just said. All of that is true. But they say you should be equitably stocked from doing it because of their perspective, you represent it was closed and they thought it was closed. Well, I believe the liability of attain is derived from the indemnity agreement, not from the bond. And the indemnity agreement does not have a provision whereby they can simply terminate their liability and say, oh, the bond is closed. Therefore, we're no longer obligated. And so I think you have to go back and look at the indemnity agreement and the terms that it has and the obligations that attain has under the and the rights that Liberty has under the indemnity agreement in order to fully assess attain's liability. To me, if someone stopped paying you premiums and you agreed to it, that kind of indicates this thing is over. There's no indemnity agreement anymore. It's kind of gone because that's kind of what insurance companies do. You don't pay their premiums, you don't get the cash it in. I don't believe so, your honor. I believe if you look at the language of the indemnity agreement, if you look at the language of the bond itself, it is very clear that the liability under the bond is not extinguished. I agree that's what the liability, I agree that's what the bond says. I guess this whole thing strikes me sort of as a comedy of errors and lots of people saying lots of things that strike me as obviously wrong, right? Like, I'm just going to posit as a starting point, it seems to me there simply had to be some way for attain to get out of this bond after they won the coverage action. And that I am going to find unpersuasive any argument that is premised on the fact that there was literally no way for them to get out of it. Do I have to think there was literally no way for them to get out of it in order to rule for you? Your honor, I don't believe so, but I don't. Okay, so how could they have got, so great, walk me through, this is not the world we live in. I think we can all agree what happened here is not ideal on any level. What should, if attain wanted to get out of this agreement, they should have done, well, if they wanted to get out of the obligation to pay this money after they won their coverage action, attain should have done what? They should have paid the underlying claimants, which is what Liberty asked them to do initially. They should have paid the judgment. But they won their coverage action. The whole point of winning the coverage action is this is not our responsibility. That's the whole point of a coverage action. That is the case, but that doesn't extinguish their obligations under the indemnity agreement or Liberty's obligations under the bond. So, and you're right, to some extent, this is a comedy of errors, but not on the part of Liberty. No, no, you're not going to win. I don't understand how when the Liberty employee tells attain the bond is closed. I know you have an argument that that means something uniquely internal to Liberty. I find that facially implausible. When someone tells me the bond is closed, I, as a reasonable person, understand, no, it's closed, closed, like the way normal human beings would use the word closed. So, I don't think you can say there's no errors on the part of Liberty here either. Your Honor, I believe the record reflects that Liberty never told attain that the bond was closed. I don't care who they told. They told attain, they told a person the district court said was attain's agent, and telling someone's agent something is the equivalent of telling that person something. I don't believe that it is established that Mr. Dunnigan is the agent of attain. But the whole rationale of the district court depends on the notion that Mr. Dunnigan was the agent of attain, because once the district court concludes Dunnigan is attain's agent, that's how the court is then able to say Liberty didn't say anything, because they rely only on a Dunnigan to attain email, and the court says, well, that can't be a misrepresentation by Liberty, because Dunnigan was attain's agent, and you can't make a misrepresentation to yourself. Your Honor, I believe that the district court looked at this factually as a whole, and looked at the elements of equitable establishment. No, the district court, I think the district court pretty clearly said there was no misrepresentation by Liberty to attain. And that is factually correct, Your Honor. Only if you don't realize that well, only if you assume that a misrepresentation to Liberty's agent is not also a misrepresentation, sorry, a misrepresentation to attain's agent is not also a misrepresentation. If someone misrepresents something to one of my law clerks, that is legally a misrepresentation to me, right? If someone, if I ask my law clerk to call a lawyer or someone about something, and that person represents something to my law clerk who is acting as my law clerk, that constitutes legally a misrepresentation to me, right? And that is a different relationship than the relationship at issue here. I mean, this is simply serving as an intermediary does not make you an agent. It's kind of like a game of telephone, right? You're going from one party to the other party. Simply because information is passed through an intermediary does not mean that that intermediary assumes the role of agent to either party. And here, I mean, one thing within the record, the bond was signed by Mr. Dunnigan on behalf of Liberty. I think that's, and that is found in the joint appendix at 32 and 33. So I don't believe that... Well, that doesn't really help you because if Dunnigan is Liberty's agent, then any misrepresentation by Dunnigan to attain is a misrepresentation by Liberty to attain. I don't believe that Mr. Dunnigan served as an agent of Liberty. You said he signed the bond on behalf of Liberty. That sounds like acting as an agent of Liberty to Well, I don't believe within the context... Do non-agents get to sign legal documents for people? Well, Your Honor, they're limited to the scope of the agency.  And I don't believe the conversations... Even if you assume all this argument, your argument is still the same. I mean, in terms of the indemnity agreement and its effect on this case. I mean, it's very clear that Attain did ask this agent broker, Dunnigan, to get that bond. He's the one that got it for him. And so there's some plausible indication he's the agent of it. I think it all comes down to when you think of a case like this and you're dealing with trials, you wonder, well, how can we fix this in the future? And one of the first questions that comes to you is, why do you get coverage determination earlier, Attain, in terms of whether you do it? Because every time it was McClure. They had a one... McClure had the judgment against them. And it was McClure that asked the court to stay the paying of it. And it was McClure that said that the court says, okay, you can stay it, but you got to post a million dollar bond. That's McClure. Attain jumps in this thing and says, they said, okay, would you do this? And they did it. They did it with you. Totally different questions of what happens after, but essentially Liberty then gets this million dollar bond. I analogize it probably incorrectly to say you put a million dollars up there on the table. And then the question is, how do you get that million dollars off the table? You don't get it by those little underlying conversations. You get it by one of two means. You either go up and you figure with the court to say you don't need it anymore, or you pay it, or you negotiate. You do something else, but you can't just do it here because you've got a court involved. When courts get involved, and the reason we... The status action unless you put a million dollar bond up. And I don't know where in the world anybody gets the notion that that million dollar bond is going to disappear here because the people that got the bond got together and says, okay, it doesn't exist anymore. Seems to me you're not including the court in the process either. Even if you paid it, you probably have to go tell the court that you paid it. Something has to be done with the court that you put that million dollar bond in. And that kind of seems to be the direction we're going here, even though you turn it on. It's very straightforward. This is not a comedy of errors. I'm going to judge hateful. This is a comedy of errors here in terms of facts. But I don't know if the outcome that determines the outcome. A lot of times we get cases with comedy of errors in it. I'm hoping somebody is learning some lessons from this. Liberty or Tane or somebody, these big time insurance companies. You got to be kidding me that we are looking at this case right here and no one knows, knew what to do here. And we read those facts and it did look like a comedy of errors. Who in the world are these people here? Big time multimillion dollar, billion dollar insurance companies and stuff doing this stuff here. And so that's kind of the posture you're in today. But I mean, your argument is pretty straightforward at least because, and I commend you, you sticking with the law and the law is getting on that indemnity contract, which is the basis upon which we're here today. Can I ask you a question about your position that I'm not a thousand percent clear on? And it sort of goes to this question of who's an agent for whom. And I understand you cited a bunch of New York cases saying whether or not Dunigan, whether or not someone misrepresenting someone, something to someone in order to have, there may have been a misrepresentation from Liberty to attain, but attain has to have actual knowledge in order to be able to claim that it relied. And I thought part of your argument was whatever got said by Liberty to Dunigan was never transmitted to, sorry, was never transmitted to attain. And so they couldn't, they couldn't actually have relied on it because Dunigan never turned around and told attain good news, the bond has been closed. And there's all these cases you cited from New York saying if you find out about communications only in discovery during the lawsuit, you can't turn around and say, well, that's what I relied on at the time. So I'm just trying to understand if Dunigan had forwarded these emails that he got from Liberty saying the thing was closed, had Mr. Dunigan forwarded those to whoever this corporate designee person is over at attain, would the fact that it went through Dunigan foreclose a reliance argument? Do you see what I'm saying? Yes, Your Honor. I believe here the facts show that attain never had actual knowledge of closure of the bond. And if they had, had it come from Dunigan, an intermediary and not from Liberty, would it still be a different case because they would have the actual knowledge even though it didn't come straight from Liberty? I believe that would certainly change the case. I don't believe that it would change the ultimate outcome. So your argument is not that it doesn't matter what Dunigan told attain because he's not their agent. Your argument, at least as it goes to actual reliance, is he didn't actually tell them anything. Correct, Your Honor. There was no actual knowledge. They've admitted they didn't have construction or they're not arguing that there was constructive knowledge. So therefore they have no knowledge of this. And if they have no knowledge, how could they possibly reasonably rely on something of which they have no knowledge? It's J.A. 501 and 500 to 501. To me on J.A. 500 to 501, the district court very clearly assumed that Dunigan is attain's agent for purposes of its analysis. It says that attain does not deny that Dunigan is his agent and the district court then leverages that to say that because they don't deny Dunigan is their agent, no statement by Dunigan can be the misleading statement because you can't mislead. Okay, so I read the district court's opinion is premised on the assumption that Dunigan is Liberty's agent. If we have to premise that Dunigan is Liberty's agent, who cares if Dunigan told anybody else at attain? That's like knowledge of an agent is imputed to the principal, right? That's black letter law. You impute the knowledge of an agent to the principal. I could cite a whole bunch of New York cases that say you impute the knowledge of an agent to a principal. The step is the reasonable reliance. I agree, but for purposes of knowledge, we impute the knowledge of the agent to the principal. I understand what you're saying. The point we are making. You deny that that's black letter law. I'm not denying the law. I'm saying that the point that we are making is that without that knowledge, there cannot be the next step of reasonable reliance. So what if Dunigan relied? What if Dunigan, now I take the whole point about the record, but what if Dunigan is deposed and the reason I didn't take any further staffs acting with my hat on as attain's agent is because I thought we were good to go because Liberty told me we were good to go. And if you had not told me we were good to go, I would have investigated. So what if Dunigan said those things? Why would it matter whether Dunigan told anybody at attain? Anybody else at attain? Because if he's their agent, he is attain. Because to your point, your honor, this is not in the record. Totally agree about that. This is not in the record. What I guess I'm saying is it seems to me that whether Dunigan told any other person at attain is sort of a red herring if he's their agent. Your honor, the entire defense of attain has evolved over time. And this latest iteration of it is this idea of equitable estoppel through an email from Liberty to Mr. Dunigan. It is undisputed that that never was received in any form or fashion by attain. So therefore, again, we can't demonstrate reasonable reliance. And again, going back to the point, there wasn't a misrepresentation in that as well. I mean, closure of a bond is an internal billing event that triggers something where premium is not charged. And that has no impact on the legal obligations of Liberty under the bond. I want to conclude on one idea. So it's important to remember that equitable estoppel is a doctrine of equity that put simply should operate in such a manner that makes the circumstances fair. There's a case that was cited by the district court, Cooper Krause Hines. It says, estoppel is imposed by law in the interest of fairness to prevent the enforcement of rights, which would work fraud or injustice upon the person against whom enforcement is sought. And who in justifiable reliance upon the opposing party's words or conduct has been misled into acting upon the belief that such enforcement would not be sought. I think we are missing a number of elements here within that. And then I want you to think about the equities of Attain's argument. They sign a contract, the terms of which remain enforceable. Liberty issues a bond on behalf of Attain's insurance in reliance upon that contract and the promises that were made therein. Attain provides incorrect documents to Mr. Dunnigan for delivery to Liberty saying that close the bond, premium should not be charged. The closure of the bond is a billing event that doesn't impact obligations under the indemnity agreement or obligations under the bond. When Liberty must pay out on the bond, it looks to Attain to fulfill its obligations under the indemnity agreement. Attain refuses to honor those obligations because of its own mistake, not Liberty's mistakes. And if I, if, if your honors have no further questions, then I will rest on my brief. Thank you for your, Ms. Schell. You have a few more moments and then we'll vote. Your honors, I want to start with this idea that a misrepresentation about the bond can't impact obligations under the indemnity agreement. The bond and the indemnity agreement are tied hand in hand. The indemnity agreement indemnifies amounts that will be paid under the bond. If Liberty represents, hey, that bond's been taken care of, it's closed, that's representing to Attain that no amounts are going to be owed under the indemnity agreement. Did Liberty conceal any facts or myths that represent the status of the bond? Yes, I think they did misrepresent the status of the bond. When they said it was closed. When they said it was closed and when they stopped charging premiums. Because insurance companies generally don't provide you coverage without you paying for them? Insurance companies have that pesky habit, that's correct. Well, it said we will close this bond and use a number in our system. That does not extinguish the obligation of the bond. It then went on in another email to say, so the first email said we will close the bond in our system. The second email said this bond has been canceled. I have backed out the 2020 renewal premium that we charge. That's important because remember back in the indemnity agreement where it talks about premiums, Liberty says we're going to charge premiums until you provide documents that satisfy us that the bond has been satisfied. And so when Liberty says we're not charging the premium anymore, Liberty is in essence under this provision in the general indemnity agreement saying we've been satisfied that we're never going to have to pay anything on that bond. That's how that comes full circle. You had mentioned that you've been in Texas and West Virginia, but which state law would be the basis for looking at this indemnity contract? The indemnity contract has a choice of law provision that provides that New York law will apply to the enforcement. New York law in terms of how we interpret that? The indemnity contract, yes. It's governed by New York law in this case. Yes, yes. The other issue is how this representation was transmitted to Tane. And again, I think it's important to look at the context. Mr. Dunnigan was a Tane's agent. Liberty knew when it was talking to Mr. Dunnigan. It expected and intended. The testimony from Liberty's folks is they expected and intended when they talked to Mr. Dunnigan that information was going to be passed on. And the information was passed on here in the form of not charging premiums. And if you look at the email communication with Mr. Dunnigan, when he's communicating with the Tane, he says, I will go work on closing this bond. We will go work on closing this bond. Should there be anything else we need from your end, we will be in touch. And Mr. Dunnigan doesn't get in touch further because he's been told the bond's been closed. That communicates to a Tane that the bond has been closed. And so that representation was absolutely transmitted to a Tane and a Tane relied on it in not taking further steps to keep going down this path of what do we need to do to deal with this bond. Although again, your corporate designee doesn't say he relied on that. In his testimony, he talks about the actions that were taken that misled him or not charging the premium and this December 19 email. What do you rely on? He points to something different. My question was, how much are you relying on the, would your argument be the same if there were no chitchat, no back and forth between these various people, but just suddenly they stopped charging premiums? Is that enough? At that point, a Tane could be like, great, for reasons unclear to us, we are off. I think if there was just the premiums stopped out of the blue, I don't think that has the same import. I think here you have to look at all the facts and context. They got a renewal premium. A lot of that if they didn't cancel the renewal, there's still, I'm just trying to figure out what way to put on the various facts. So now imagine they continue to bill, but there's this email exchange that does or doesn't make its way to a Tane. Yeah, if they continued to bill premium, I think that's a representation in conduct from Liberty Mutual that would factor in and show that Liberty didn't consider this bond released. I think that would be a different fact. What I look at is, and I'm going to get my chronology wrong, but after all of this happens, the McClure's lawyer emails a Tane and says, please continue funding the defense because there's an oral argument and he says there is an appeal bond in place written by Liberty Mutual Insurance Company. Do I factor that in when I look at all the facts that a Tane is actually told, hey, there is a bond in place? Yeah, and I don't put much weight on that fact. It's coming from defense counsel who was not privy to any of the conversations that have been going on about the bond itself and about the cancellation of the bond. Like he says, it's in place. He may be the one lawyer in all of this who checked with the state court and was like, yeah, there's a bond in place. Yeah, and I hear that. I think that the fact that he's defense counsel and he's not been involved in any of the discussions tempers why, that explains why a Tane doesn't do anything in reaction to that. All right. Well, thank you very much for your argument. Thank both counsels. We'll come down and brief you. We'll proceed to the next case after we brief counsel.
judges: James Andrew Wynn, Pamela A. Harris, Toby J. Heytens